# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO
### EASTERN DIVISION

| | |
|---|---|
| RICHARD LERACH, Derivatively on Behalf of NATIONAL CITY CORPORATION, ) ) | Case No. |
| Plaintiff, ) ) ) | |
| vs. ) ) | VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACH OF |
| PETER E. RASKIND, DAVID A. DABERKO, JEFFREY D. KELLY, PHILIP L. RICE, STEPHEN A. STITLE, DAVID L. ZOELLER, SHELLEY J. SEIFERT, THOMAS A. RICHLOVSKY, JAMES P. GULICK, PAUL D. GERAGHTY, TIMOTHY J. LATHE, JEFFREY J. TENGEL, DANIEL J. FRATE, MORRY WEISS, JAMES S. BROADHURST, JON E. BARFIELD, PAUL A. ORMOND, JERRY SUE THORNTON, GERALD L. SHAHEEN, CHRISTOPHER M. CONNOR, BERNADINE P. HEALY, MICHAEL B. MCCALLISTER, JAMES R. BELL, III, TED M. PARKER, WILLIAM E. MACDONALD, III, JOHN D. GELLHAUSEN AND S. CRAIG LINDNER, ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | FIDUCIARY DUTY, WASTE OF CORPORATE ASSETS, UNJUST ENRICHMENT AND VIOLATION OF SECTION 10(B) OF THE SECURITIES EXCHANGE ACT OF 1934 |
| Defendants, ) ) | |
| -and- ) ) | |
| NATIONAL CITY CORPORATION, a Delaware corporation, ) ) ) | |
| Nominal Defendant. ) ) | DEMAND FOR JURY TRIAL |

Plaintiff, by his attorneys submits this Verified Shareholder Derivative Complaint against the defendants named herein.

## NATURE AND SUMMARY OF THE ACTION

1.      This is a shareholder derivative action brought by a shareholder of National City Corporation ("National City" or the "Company"), on behalf of the Company against certain of its officers and directors seeking to remedy defendants' violations of state and federal law, including breaches of fiduciary duties, waste of corporate assets, unjust enrichment and violations of the Securities Exchange Act of 1934 ("Exchange Act")  that occurred between July 2006 and the present (the "Relevant Period") and that have caused substantial monetary losses to National City and other damages, such as to its reputation and goodwill.

2.      National City provides a wide range of financial services.  Some of those services include mortgage finance services.  During the Relevant Period, National City, under defendants' direction, issued a series of improper statements concerning the Company's exposure to the growing subprime mortgage crisis.  Among other things, National City's earnings press releases suggested that the sale of its subprime lending unit, First Franklin, during the fourth quarter of 2006 would lessen the Company's exposure and pave the way for improved earnings.

3.      On October 25, 2007, however, National City's disclosed that "unprecedented disruption and weakness in the mortgage and housing markets" had forced it to restructure its mortgage business.  This restructure would include the reclassification of over $4.4 billion in home equity lines and loans that were no longer suitable for sale and a $218 million increase to the Company's provision for credit losses.

4.      While defendants were directing National City to issue improper statements concerning its exposure to the subprime market crisis, they were also directing National City to repurchase over $3.4 billion worth of its own shares at artificially inflated prices.  Even worse, certain of the defendants sold their personally held shares while in possession of material non-public information for over $31.9 million in proceeds.

5.     As a result of the improper financial reporting, National City's credibility with investors has diminished.  During the Relevant Period, the Company's value has declined from over $38 per share to less than $15 per share—an $11.3 billion market capitalization loss.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction in this case arising under Article III of the United States Constitution and 28 U.S.C. §1331 because of claims arising under the Exchange Act. This Court also has supplemental jurisdiction pursuant to 28 U.S.C. §1367(a) over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

7.     This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the District courts permissible under traditional notions of fair play and substantial justice.

8.     Venue is proper in this Court pursuant to 28 U.S.C. §1391(a) because: (i) National City maintains its principal place of business in the District; (ii) one or more of the defendants either resides in or maintains executive offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to National City occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District

## THE PARTIES

9.     Plaintiff Richard Lerach is and was, at times relevant hereto, an owner and holder of National City common stock.

10.     Nominal defendant National City is a Delaware corporation with its principal executive offices located at 1900 East Ninth Street, Cleveland, Ohio.  National City provides commercial and retail banking, mortgage financing and servicing, consumer finance and asset management services.

11.     Defendant Peter E. Raskind ("Raskind") is National City's Chairman of the Board and has been since December 2007.  Raskind is also National City's Chief Executive Officer and has been since July 2007 and President and a director and has been since December 2006.  Raskind was National City's Vice Chairman from December 2004 to December 2006 and Executive Vice President from 2000 to December 2004.  Because of his positions, defendant Raskind knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of National City.  During the Relevant Period, Raskind participated in the issuance of improper statements, including the preparation of the improper press releases and Securities and Exchange Commission ("SEC") filings and approval of other statements made to the press, securities analysts and National City shareholders.   Defendant Raskind received the following compensation:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Changes in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation |
|---|---|---|---|---|---|---|---|
| 2006 | $570,000 | $163,861 | $1,368,059 | $311,229 | $1,606,575 | $223,384 | $97,220 |

12.     Defendant David A. Daberko ("Daberko") was National City's Chairman of the Board from 1995 to December 2007.  Daberko was also a National City director from 1988 to December 2007 and Chief Executive Officer from 1995 to July 2007.  Because of his positions, defendant Daberko knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of National City.  During the Relevant Period, Daberko participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and

approval of other statements made to the press, securities analysts and National City shareholders.  Defendant Daberko received the following compensation:

| Fiscal Year | Salary | Restricted Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | All Other Compensation |
|---|---|---|---|---|---|
| 2006 | $1,000,000 | $1,883,237 | $2,658,372 | $3,036,000 | $500,671 |

Defendant Daberko sold 221,997 shares of National City stock for $8,360,668.64 in proceeds while in possession of material non-public information.

13.     Defendant Jeffrey D. Kelly ("Kelly") is a National City director and has been since December 2007.  Kelly is also National City's Vice Chairman and has been since December 2004 and Chief Financial Officer and has been since 2000.  Kelly was National City's Executive Vice President from 1994 to December 2004.  Because of his positions, defendant Kelly knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of National City.  During the Relevant Period, Kelly participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and National City shareholders.  Defendant Kelly received the following compensation:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Changes in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation |
|---|---|---|---|---|---|---|---|
| 2006 | $555,000 | $337,906 | $1,722,995 | $312,591 | $1,544,018 | $384,573 | $137,768 |

Defendant Kelly sold 119,725 shares of National City stock for $4,565,114.25 in proceeds while in possession of material non-public information.

14.     Defendant Philip L. Rice ("Rice") is a National City Executive Vice President and has been since 2000.  Rice is also National City Bank's President and Chief Executive Officer and has been since 2000.  Because of his positions, defendant Rice knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the

adverse non-public information about the business of National City.  During the Relevant Period, Rice participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and National City shareholders.  Defendant Rice sold 56,471 shares of National City stock for $2,222,284.32 in proceeds while in possession of material non-public information.

15.     Defendant Stephen A. Stitle ("Stitle") is a National City Executive Vice President and has been since 1999.  Stitle is also Chairman of National City Bank of Indiana and has been since 1995.  Because of his positions, defendant Stitle knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of National City.  During the Relevant Period, Stitle participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and National City shareholders.  Defendant Stitle sold 41,757 shares of National City stock for $1,573,403.76 in proceeds while in possession of material non-public information.

16.     Defendant David L. Zoeller ("Zoeller") is a National City Executive Vice President and has been since 2000.  Zoeller is also National City's General Counsel and Secretary and has been since 1992.  Because of his positions, defendant Zoeller knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of National City.  During the Relevant Period, Zoeller participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and National City shareholders.  Defendant Zoeller sold 32,440 shares of National City stock for $1,243,485.08 in proceeds while in possession of material non-public information.

17.     Defendant Shelley J. Seifert ("Seifert") is a National City Executive Vice President and has been since 2000.  Because of her position, defendant Seifert knew, consciously

disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of National City.  During the Relevant Period, Seifert participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and National City shareholders.  Defendant Seifert sold 31,196 shares of National City stock for $1,162,051.00 in proceeds while in possession of material non-public information.

18.     Defendant Thomas A. Richlovsky ("Richlovsky") is National City's Senior Vice President and Treasurer and has been since 1989.  Because of his positions, defendant Richlovsky knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of National City.  During the Relevant Period, Richlovsky participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and National City shareholders.  Defendant Richlovsky sold 29,977 shares of National City stock for $1,143,023.01 in proceeds while in possession of material non-public information.

19.     Defendant James P. Gulick ("Gulick") is National City's General Auditor and a Senior Vice President and has been since 1995.  Because of his positions, defendant Gulick knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of National City.  During the Relevant Period, Gulick participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and National City shareholders.  Defendant Gulick sold 30,091 shares of National City stock for $1,138,944.35 in proceeds while in possession of material non-public information.

20.     Defendant Paul D. Geraghty ("Geraghty") is a National City Executive Vice President and has been since April 2004. Geraghty was also a National City Senior Vice

President from October 2002 to April 2004.  Because of his positions, defendant Geraghty knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of National City.  During the Relevant Period, Geraghty participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and National City shareholders.  Defendant Geraghty sold 17,974 shares of National City stock for $671,263.68 in proceeds while in possession of material non-public information.

21.     Defendant Timothy J. Lathe ("Lathe") is a National City Executive Vice President and head of the Private Client Group and has been since 2000.  Because of his positions, defendant Lathe knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of National City.  During the Relevant Period, Lathe participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and National City shareholders.  Defendant Lathe sold 11,195 shares of National City stock for $430,895.55 in proceeds while in possession of material non-public information.

22.     Defendant Jeffrey J. Tengel ("Tengel") is a National City Executive Vice President and has been since October 2006.  From December 2002 to October 2006, Tengel held a variety of credit positions with National City, including Senior Vice President and Chief Credit Officer. Prior to December 2002, Tengel was National City's Senior Managing Director and Head of Debt Capital Markets.  Because of his positions, defendant Tengel knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of National City.  During the Relevant Period, Tengel participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and National City shareholders.  Defendant Tengel sold 8,678 shares of

National City stock for $320,848.94 in proceeds while in possession of material non-public information.

23.     Defendant Daniel J. Frate ("Frate") is a National City Executive Vice President and has been since 2005.  Frate is also a National City Senior Vice President and Head of the Retail Banking Business Line and has been since 2003.  Because of his positions, defendant Frate knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of National City. During the Relevant Period, Frate participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and National City shareholders.  Defendant Frate received the following compensation:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Changes in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation |
|---|---|---|---|---|---|---|---|
| 2006 | $437,500 | $100,000 | $767,560 | $873,774 | $941,300 | $46,548 | $81,853 |

Defendant Frate sold 7,866 shares of National City stock for $286,951.68 in proceeds while in possession of material non-public information.

24.     Defendant Morry Weiss ("Weiss") is a National City director and has been since 1993.  Weiss is also Chairman of National City's Risk and Public Policy Committee and has been since 2007 and a member of the Risk and Public Policy Committee and Audit Committee and has been since 2005.  Because of his positions, defendant Weiss knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of National City.  During the Relevant Period, Weiss participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and National City shareholders.

-8-

25.     Defendant James S. Broadhurst ("Broadhurst ") is a National City director and has been since 1996.  Broadhurst is also Chairman of National City's Audit Committee and a member of the Risk and Public Policy Committee and has been since 2005.  Because of his positions, defendant Broadhurst knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of National City.  During the Relevant Period, Broadhurst participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and National City shareholders.

26.     Defendant Jon E. Barfield ("Barfield ") is a National City director and has been since 1998.  Barfield is also a member of National City's Risk and Public Policy Committee and has been since 2006 and a member of the Audit Committee and has been since 2005.  Because of his positions, defendant Barfield knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of National City.  During the Relevant Period, Barfield participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and National City shareholders.

27.     Defendant Paul A. Ormond ("Ormond") is a National City director and has been since 1999. Ormond is also Chairman of National City's Compensation and Organization Committee and has been since 2005.  Because of his positions, defendant Ormond knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of National City.  During the Relevant Period, Ormond participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and National City shareholders.

28.     Defendant Jerry Sue Thornton ("Thornton") is a National City director and has been since 2001.  Thornton is also a member of National City's Risk and Public Policy Committee and has been since 2006 and a member of the Audit Committee and has been since 2005.  Because of her positions, defendant Thornton knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of National City.  During the Relevant Period, Thornton participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and National City shareholders.

29.     Defendant Gerald L. Shaheen ("Shaheen") is a National City director and has been since 2001.  Shaheen is also a member of National City's Compensation and Organization Committee and has been since 2005.  Because of his positions, defendant Shaheen knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of National City.  During the Relevant Period, Shaheen participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and National City shareholders.

30.     Defendant Christopher M. Connor ("Connor") is a National City director and has been since 2002. Connor is also a member of National City's Compensation and Organization Committee and has been since 2005.  Because of his positions, defendant Connor knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of National City.  During the Relevant Period, Connor participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and National City shareholders.

31.     Defendant Bernadine P. Healy ("Healy") is a National City director and has been since 2003.  Healy was also a National City director from 1995 to 2001 and from 1989 to 1990.

Healy is a member of National City's Compensation and Organization Committee and has been since 2006.  Because of her positions, defendant Healy knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of National City.  During the Relevant Period, Healy participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and National City shareholders.

32.     Defendant Michael B. McCallister ("McCallister") is a National City director and has been since December 2006.  Because of his position, defendant McCallister knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of National City.  During the Relevant Period, McCallister participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and National City shareholders.

33.     Defendant James R. Bell, III ("Bell") was National City's Chief Risk Officer from April 2004 to November 2007.  Bell was also a National City Executive Vice President from 1996 to November 2007; Head of Capital Markets Group from 2000 to 2004; and Head of the Retail Sales and Distribution Functions from 1998 to 2004.  Because of his positions, defendant Bell knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of National City.  During the Relevant Period, Bell participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and National City shareholders.  Defendant Bell received the following compensation:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Securities Underlying Options | LTIP Payouts | All Other Compensation |
|---|---|---|---|---|---|---|
| 2005 | $420,833 | $780,456 | $442,196 | $22,500 | $133,665 | $33,812 |

Defendant Bell sold 145,801 shares of National City stock for $5,505,221.53 in proceeds while in possession of material non-public information.

34.     Defendant Ted M. Parker ("Parker") was a National City Executive Vice President from 2001 to at least February 2007.  Because of his position, defendant Parker knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of National City.  During the Relevant Period, Parker participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and National City shareholders.  Defendant Parker sold 28,871 shares of National City stock for $1,069,189.03 in proceeds while in possession of material non-public information.

35.     Defendant William E. MacDonald, III ("MacDonald") was National City's Vice Chairman from 2001 to December 2006.  MacDonald was also a National City Senior Executive Vice President from 1999 to 2001.  Because of his positions, defendant MacDonald knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of National City.  During the Relevant Period, MacDonald participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and National City shareholders.  Defendant MacDonald received the following compensation:

| Fiscal Year | Salary | Restricted Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Changes in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation |
|---|---|---|---|---|---|---|
| 2006 | $695,833 | $336,862 | $758,243 | $1,956,325 | $640,277 | $2,122,961 |

Defendant MacDonald sold 26,485 shares of National City stock for $968,291.60 in proceeds while in possession of material non-public information.

36. Defendant John D. Gellhausen ("Gellhausen") was a National City Executive Vice President from 2002 to January 2007. Gellhausen was also National City's President and Chief Operating Officer from 2000 to 2002. Because of his positions, defendant Gellhausen knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of National City. During the Relevant Period, Gellhausen participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and National City shareholders. Defendant Gellhausen sold 17,373 shares of National City stock for $636,786.30 in proceeds while in possession of material non-public information.

37. Defendant S. Craig Lindner ("Lindner") was a National City director from 2004 to April 2007. Lindner was also a member of National City's Audit Committee and Risk and Public Policy Committee from 2005 to April 2007. Because of his positions, defendant Lindner knew, consciously disregarded, was reckless and grossly negligent in not knowing and should have known the adverse non-public information about the business of National City. During the Relevant Period, Lindner participated in the issuance of improper statements, including the preparation of the improper press releases and SEC filings and approval of other statements made to the press, securities analysts and National City shareholders.

38. The defendants identified in ¶¶11-13, 24-32, 37 are referred to herein as the "Director Defendants." The defendants identified in ¶¶11-23, 33-36 are referred to herein as the "Officer Defendants." The defendants identified in ¶¶12-23, 33-36 are referred to herein as the "Insider Selling Defendants." Collectively, the Director Defendants and the Officer Defendants are referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

39.    By reason of their positions as officers, directors and/or fiduciaries of National City and because of their ability to control the business and corporate affairs of National City, the Individual Defendants owed National City and its shareholders fiduciary obligations of trust, loyalty, good faith and due care, and were and are required to use their utmost ability to control and manage National City in a fair, just, honest and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of National City and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

40.    Each director and officer of the Company owes to National City and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.  In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's revenue, margins, operations, performance, management, projections and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

41.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of National City, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.  Because of their advisory, executive, managerial and directorial positions with National City, each of the Individual Defendants had access to adverse non-public information about the financial condition, operations, and improper representations of National City.

42.    At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of National City, and was at all times acting within the course and scope of such agency.

43. To discharge their duties, the officers and directors of National City were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company. By virtue of such duties, the officers and directors of National City were required to, among other things:

(a) refrain from acting upon material inside corporate information to benefit themselves;

(b) ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

(c) conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(d) properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

(e) remain informed as to how National City conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(f) ensure that the Company was operated in a diligent, honest and prudent manner in compliance with all applicable laws, rules and regulations.

44. Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to the Company and to its shareholders the fiduciary duties of loyalty, good faith and the exercise of due care and diligence in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets. The conduct of

the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of National City, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.  The conduct of the Individual Defendants who were also officers and/or directors of the Company during the Relevant Period have been ratified by the remaining Individual Defendants who collectively comprised all of National City's Board during the Relevant Period.

45.     The Individual Defendants breached their duties of loyalty and good faith by allowing defendants to cause, or by themselves causing, the Company to misrepresent its financial results and prospects, as detailed herein *infra*, and by failing to prevent the Individual Defendants from taking such illegal actions.

## CONSPIRACY, AIDING AND ABETTING AND CONCERTED ACTION

46.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their common plan or design.  In addition to the wrongful conduct herein alleged as giving rise to primary liability, the Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

47.     During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to and did: (i) conceal the fact that the Company was improperly misrepresenting its business prospects; (ii) enhance the Individual Defendants' executive and directorial positions at National City and the profits, power and prestige that the Individual Defendants enjoyed as a result of holding these positions; (iii) sell over $31.2 million of their personally held shares; and (iv) deceive the investing public, including shareholders of National City, regarding the Individual Defendants' management of National City's operations, the Company's financial health and stability, and its future business prospects, specifically related to the Company's financials that had been misrepresented by

defendants throughout the Relevant Period.  In furtherance of this plan, conspiracy and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

48.     The Individual Defendants engaged in a conspiracy, common enterprise and/or common course of conduct during the Relevant Period.  During this time, the Individual Defendants caused the Company to conceal the true fact that National City was misrepresenting its business prospects.

49.     The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to disguise the Individual Defendants' breaches of fiduciary duty, waste of corporate assets, unjust enrichment and violations of the Exchange Act; and to conceal adverse information concerning the Company's operations, financial condition and future business prospects.

50.     The Individual Defendants accomplished their conspiracy, common enterprise and/or common course of conduct by causing the Company to purposefully, recklessly or negligently release improper statements.  Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary and substantial participant in the conspiracy, common enterprise and/or common course of conduct complained of herein.

51.     Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein.  In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his overall contribution to and furtherance of the wrongdoing.

### THE SUBPRIME MARKET CRISIS

52.     National City provides a wide range of financial services.  Some of those services include mortgage finance services.  During times relevant hereto, the Individual Defendants directed National City provide those services in connection with mortgages made to subprime borrowers.  A subprime borrower is someone with a low credit score, higher debt-to-income

ratio, or other characteristics associated with a high probability of default relative to "prime" or less-risky borrowers.

53.     In an environment of appreciating home prices and low interest rates, subprime borrowers are typically able to stay current due to the rising equity in their property.  But in an environment of depreciating home prices, increasing default rates are the norm.  This is exactly what has been occurring since at least mid 2006.

54.     In fact, as early as 2005, bankers and economists alike were expressing concern over the rising delinquency rates in nontraditional mortgages such as subprime mortgages, especially because the risk of delinquency would be heightened by a downturn in the housing market.  For example, on August 24, 2005, *USA Today* reported that economists and bankers were "getting nervous about the wide use of higher-risk financing, such as … subprime mortgages for low-income home buyers."  As chief economist Doug Duncan of the Mortgage Bankers Association stated in the article, easy financing helps people buy homes, but also raises foreclosure risks.

55.     Similarly, at the CPR & CDR's Prepayment and Mortgage Credit Modeling & Strategy Conference in October 2005, Freddie Mac Chief Economist Frank Nothaft stated that subprime delinquency rates remained worrisome, with subprime delinquencies as much as eight to nine times higher than prime loans.

56.     In a December 26, 2005 *Business Week* article, JPMorgan Chase & Co. estimated that risky subprime loans made up close to 9% of mortgage debt—large enough to make a downturn worse if those loans began to fail in large numbers.

57.     Governor Susan Schmidt Bies, a member of the Federal Reserve Board, gave a speech at the Financial Services Institute on February 2, 2006.  In her speech, Bies noted that the Federal Reserve and other banking supervisors were concerned that then-current risk-management techniques did not fully address the level of risk in nontraditional mortgages such as subprime mortgages—a risk that would be heightened by a downturn in the housing market.

Bies also stated that lenders were increasingly combining nontraditional mortgage loans with weaker mitigating controls on credit exposures.

58.     These concerns range true in 2006, as a subprime mortgage crisis erupted. During the first stage of this crisis, several prominent subprime lenders including New Century Financial Corporation declared bankruptcy as liquidity dried up and the lenders found themselves unable to continue originating loans.  Other subprime lenders, such as Accredited Home Lenders Holding Company, staged fire sales in a desperate attempt to raise cash to stay afloat.

59.     Throughout the Relevant Period, the Individual Defendants recklessly directed National City to provide mortgage services in connection with subprime loans and to inaccurately report the Company's resulting exposure.

## IMPROPER STATEMENTS

60.     The Individual Defendants by their fiduciary duties of care, good faith and loyalty owe to National City a duty to ensure that the Company's financial reporting fairly represents the operations and financial condition of the Company.  In order to adequately carry out these duties, it is necessary for the Individual Defendants to know and understand the material, non-public information that should be either disclosed or omitted from the Company's public statements.

61.     This material, non-public information principally included National City's exposure to the subprime lending market crisis.  Furthermore, defendants Barfield, Broadhurst, Lindner, Thornton and Weiss, as members of the Audit Committee, had a special duty to know and understand this material information as set out in the Audit Committee's charter which provides that that the committee is responsible for reviewing and discussing earnings press releases and financial information and earnings guidance provided to analysts and rating agencies.  Defendants Barfield, Broadhurst, Lindner, Thornton and Weiss also had a special duty to know and understand this material information as members of the Risk and Public Policy Committee.  The Risk and Public Policy Committee is responsible, under its charter, for

implementing policies and procedures for managing National City's exposure to the subprime mortgage crisis.

62. The Officer Defendants had ample opportunity to discuss this material information with their fellow officers at management meetings and via internal corporate documents and reports. Moreover, the Director Defendants as directors of National City had ample opportunity to discuss this material information with management and fellow directors at any of the Board meetings that occurred during the Relevant Period, as well as at meetings of committees of the Board. Despite these duties, the Individual Defendants negligently, recklessly and/or intentionally caused or allowed, by their actions or inactions, the following improper statements to be disseminated by National City to the investing public and the Company's shareholders during the Relevant Period.

63. On July 18, 2006, the Individual Defendants caused or allowed National City to issue a press release announcing its fiscal second quarter 2006 earnings. The press release reported earnings of $473 million. Defendant Daberko commented in the press release that: "Credit quality continues to be sound for the company as a whole." In particular, the press release provided as follows:

> National City Corporation today reported net income of $473 million, or $.77 per diluted share, for the second quarter of 2006, compared to $459 million, or $.74 per diluted share, for the immediately preceding quarter, and $625 million, or $.97 per diluted share, for the prior year period. For the six months ended June 30, 2006 and 2005, net income was $932 million, or $1.51 per diluted share, and $1.1 billion, or $1.71 per diluted share, respectively.

> Chairman's Comments

> Chairman and CEO David A. Daberko commented, "We were very pleased with the results for the second quarter. Corporate loan growth has been strong. Our retail banking business had its best quarter ever with excellent revenue growth. Credit quality continues to be sound for the company as a whole. Net income comparisons to the prior year are affected by the large mortgage servicing hedging gains recorded in the second quarter of 2005, compared to net hedging losses this year. Excluding hedging results, earnings were up sharply compared to the prior year, driven by strong operating performance in our retail, small business, and corporate banking units."

> \* \* \*

Loans and Deposits

Average portfolio loans were $102 billion for the second quarter of 2006, a 3% decrease from the preceding quarter and the prior year period. Strong growth was experienced in commercial loans which are up 4% on a linked-quarter basis and 6% on a year-over-year basis. The overall decline in portfolio loans was principally due to the implementation of an "originate-and-sell" strategy for nonconforming mortgage loans and home equity lines and loans in 2006. Core deposit growth continued, with average consumer and small business deposits up 5% compared to the second quarter of last year.

*   *   *

Credit Quality

Credit quality continues to be sound. The provision for credit losses for the second quarter of 2006 was $60 million, up from $27 million in the preceding quarter and $26 million in the second quarter a year ago. Second quarter 2006 net charge-offs were $76 million, compared to $121 million in the preceding quarter and $72 million in the second quarter a year ago. Net charge-offs decreased compared to the preceding quarter primarily due to large charge-offs realized in the first quarter on previously reserved passenger airline leases and consumer bankruptcies. The higher levels of consumer losses associated with late 2005 bankruptcy filings are now substantially complete.

For the first half of 2006, the provision for credit losses was $87 million compared with $96 million in the year-earlier period. Net charge-offs for the first half of 2006 were $197 million compared to $159 million in the comparable period in 2005. Net charge-offs increased in 2006 due to $55 million of charge-offs associated with the passenger airline leases and consumer bankruptcies noted above. Excluding these matters, net charge-offs were lower than last year.

Nonperforming assets were $667 million at June 30, 2006, compared to $647 million at March 31, 2006 and $596 million at December 31, 2005. The allowance for loan losses was $989 million, or .98% of portfolio loans, at June 30, 2006 compared to $1.1 billion, or 1.03% of portfolio loans, as of December 31, 2005.

64.     On October 17, 2006, the Individual Defendants caused or allowed National City to issue a press release announcing its earnings for its third fiscal quarter 2006.   The press release reported earnings of $551 million.  Defendant Daberko commented that "the mortgage-related businesses are performing well in a cyclically tough mortgage environment."   In particular, the press release provided as follows:

National City Corporation today reported net income of $551 million, or $.90 per diluted share, for the third quarter of 2006, compared with $473 million, or $.77 per diluted share, for the immediately preceding quarter, and $478 million, or $.74 per diluted share, for the third quarter a year ago. For the nine month periods ending September 30, 2006 and 2005, net income was $1.5 billion, or $2.41 per diluted share, and $1.6 billion, or $2.45 per diluted share, respectively.

## Chairman's Comments

Chairman and CEO David A. Daberko commented, "We were very pleased with the results for the quarter. Commercial and retail lending volumes were quite good. Total revenues were up 6% over last year, led by strong growth in fees and other income. Net interest margin has been stable, despite a challenging interest rate picture. Our corporate and retail banking businesses are well on their way to producing record results this year, while the mortgage-related businesses are performing well in a cyclically tough mortgage environment."

\* \* \*

## Loans and Deposits

Average portfolio loans were $97 billion for the third quarter of 2006, compared with $102 billion in the preceding quarter and $108 billion in the third quarter a year ago. Commercial loan and credit card balances increased on both a linked-quarter and year-over-year basis. Balances of broker-originated home equity and non-prime mortgage loans declined approximately 21% compared to a year ago, largely a result of a decision to begin selling all of the new production as described above, as well as the transfer of approximately $6 billion of non-prime mortgage loans into the held-for-sale category. Core deposit growth continued, with average consumer and small business deposits up 5% compared to the third quarter of last year. The company's "points from National City" rewards program continued to show rapid customer acceptance.

\* \* \*

## Credit Quality

Credit quality continues to be relatively stable. The provision for credit losses for the third quarter of 2006 was $73 million, up from $60 million in the preceding quarter and $56 million in the third quarter a year ago. Net charge-offs were $117 million in the third quarter of 2006, compared with $76 million in the second quarter and $83 million in the third quarter a year ago. Charge-offs increased in the third quarter of 2006 primarily due to $10 million of fraud-related mortgage loan losses and a charge of $14 million to the allowance for loan losses related to certain nonconforming mortgage loans transferred to held for sale.

For the first nine months of 2006, the provision for credit losses was $160 million compared with $152 million in the comparable period last year. Net charge-offs for the first nine months of 2006 were $314 million compared with $242 million in the prior year. Net charge-offs increased in 2006 due to losses associated with passenger airline leases, consumer bankruptcies, as well as the matters described above.

Nonperforming assets were $689 million at September 30, 2006, compared with $667 million at June 30, 2006 and $596 million at December 31, 2005. On a linked-quarter basis, the increase in nonperforming assets reflects higher levels of real estate in foreclosure, including GNMA insured loans of $60 million at September 30, 2006, $50 million as of June 30, 2006, and $0 as of December 31, 2005. As these loans are insured by GNMA, no significant losses are expected upon completion of the foreclosure process.

The allowance for loan losses was $932 million, or 1.00% of portfolio loans, at September 30, 2006, compared with $989 million or .98% of portfolio loans at June 30, 2006, and $1.1 billion, or 1.03% of portfolio loans as of December 31, 2005.

65.     On January 23, 2007, the Individual Defendants caused or allowed National City to issue a press release announcing its earnings for its fiscal fourth quarter and fiscal year 2006. The press release reported earnings of $398 million for the quarter and $2.3 billion for the year. In the press release, defendant Daberko emphasized that the sale of First Franklin, the Company's subprime lending unit, would allow National City to "now focus more intently on [its] core businesses, almost all of which performed well in 2006."  In particular, the press release reported as follows:

National City Corporation reports fourth quarter 2006 net income was $842 million, or $1.36 per diluted share, and full year 2006 net income was $2.3 billion, or $3.72 per diluted share. Fourth quarter 2005 net income was $398 million, or $.64 per diluted share, and full year 2005 net income was $2.0 billion, or $3.09 per diluted share.

Results for the fourth quarter of 2006 include a gain on the sale of the First Franklin nonconforming mortgage origination and servicing platform of $622 million after-tax, or $1.00 per diluted share. Fourth quarter 2006 results also include after-tax charges of $172 million, or $.28 per diluted share, for credit losses on the First Franklin run-off portfolio, realized losses on sales of former First Franklin portfolio loans and fair value writedowns on such loans held for sale. For the full year, such losses were $197 million after-tax, or $.32 per diluted share.

Chairman's Comments

Chairman and CEO David A. Daberko commented, "National City made the strategic decision more than a year ago to focus its efforts and resources primarily on core banking businesses where there is a direct relationship between the customer and the bank across a number of product categories. Investments have been and will continue to be directed to broadening and deepening such relationships. Along the way, we have exited a number of indirect or broker-based businesses, culminating with the sale in the fourth quarter of First Franklin, our non-prime mortgage company. The fourth quarter benefited from the large gain on the sale of First Franklin, partially offset by losses incurred on the sale and writedown of certain loans associated with this unit. Approximately $7.3 billion of such loans remain on our balance sheet in run-off mode.

As we enter 2007, we can now focus more intently on our core businesses, almost all of which performed well in 2006. The two biggest units, Wholesale Banking and Consumer and Small Business, had their best years ever as loan volumes, deposit volumes and fee income all rose. Net interest margin has been stable while credit quality in the core consumer and commercial portfolios continues to be good. Our asset management businesses also had a positive year.

Reflecting weakness in the housing market, our prime mortgage and national home equity businesses saw declines in their operating results. With the recent completion of our two acquisitions in Florida, we look forward to further growth and expansion in these attractive markets."

\* \* \*

Loans and Deposits

Average portfolio loans were $93.1 billion for the fourth quarter of 2006, compared with $97.4 billion for the third quarter of 2006, and $106.4 billion for the fourth quarter a year ago. The linked quarter decline in average portfolio loans resulted from the transfer of approximately $6 billion of nonconforming mortgages to held for sale near the end of the third quarter. Approximately $3.9 billion of these loans were sold prior to year end. The decline in average portfolio loans compared to the fourth quarter of last year reflects the implementation of a strategy to sell substantially all non- footprint, broker-originated home equity and nonconforming mortgage production.  As a result, originations of these consumer loans in 2006 were included in loans held for sale rather than held in portfolio as in the prior year. Exclusive of First Franklin originated loans and broker-sourced home equity lines of credit which are in run-off, average portfolio loans were $77.5 billion in the fourth quarter of 2006, up from $75.2 billion in the preceding quarter, and $72.5 billion in the fourth quarter a year ago.

For the full year, average portfolio loans were $99.4 billion for 2006 and $105.3 billion for 2005. The decrease in the loan portfolio is attributable to the originate and sell strategy described above. Exclusive of First Franklin originated loans and broker-sourced home equity lines, average portfolio loans were $74.9 billion in 2006 versus $72.3 billion in 2005. Good growth was experienced in commercial loans, as well as credit card and other unsecured borrowings, which increased by 8% and 10%, respectively, compared to a year ago. Average loans held for sale increased to $13.5 billion in 2006 compared to $11.1 billion in 2005 which reflects more loans classified as held for sale in 2006.

Average total deposits were $84.5 billion in the fourth quarter of 2006, up slightly from the preceding quarter and the fourth quarter a year ago. Interest checking and money market savings account balances increased throughout 2006, partially offset by lower balances of broker-originated certificates of deposits. Average core deposits, excluding escrow and custodial balances, were $66.5 billion in the fourth quarter of 2006, up 4% over the fourth quarter a year ago. The growth in core deposits is reflective of a trend of household growth and expansion in relationships per household, aided by the industry-leading National City points rewards program.

\* \* \*

Credit Quality

The provision for credit losses was $323 million for the fourth quarter of 2006 compared with $73 million in the preceding quarter and $132 million in the fourth quarter of 2005. For the full year, the provision was $483 million in 2006 compared with $284 million in 2005. The higher provision in 2006 is primarily attributable to anticipated credit losses on the run-off portfolio of First Franklin nonconforming mortgage loans. As of December 31, 2006, $7.3 billion of these First Franklin nonconforming loans remained in portfolio.

Net charge-offs in the fourth quarter of 2006 were $128 million, compared with $117 million in the preceding quarter, and $138 million in the fourth quarter of last year. Net charge-offs were $442 million in 2006 compared with $380 million a year ago, with the increase driven by nonconforming mortgage loans, passenger airline leases, and certain consumer loans affected by 2005 bankruptcy filings.

Nonperforming assets were $732 million at December 31, 2006, up from $596 million a year ago, which reflects the addition of two large residential real estate developers, as well as an increase in real estate in foreclosure. Real estate in foreclosure included higher balances of nonconforming mortgages, as well as $60 million of GNMA insured loans which were not classified as nonperforming assets prior to 2006. The allowance for loan losses was $1.1 billion as of December 31, 2006 and 2005, representing 1.18% and 1.03% of portfolio loans at December 31, 2006 and 2005, respectively.

66.     On April 30, 2007, the Individual Defendants caused or allowed National City to issue a press release announcing its earnings for its first fiscal quarter 2007.  The press release reported earnings of $319 million.   Defendant Daberko commented that National City's "mortgage business continues to operate in a difficult environment, but [the Company has] *less exposure* to the mortgage sector than in prior years.  Overall, we expect each successive quarter from here to show improved earnings."  In particular, the press release provided as follows:

National City Corporation today reported first quarter 2007 net income of $319 million, or $.50 per diluted share, compared to $459 million, or $.74 per diluted share for the first quarter of 2006. Fourth quarter 2006 earnings were $842 million, or $1.36 per diluted share, including a nonrecurring gain of $1.00 per diluted share from the sale of the Corporation's former First Franklin nonconforming mortgage origination and servicing platform, partially offset by charges associated with the retained First Franklin portfolio. First quarter 2007 results included further charges associated with the retained First Franklin portfolio. In addition, other unusual or nonrecurring items also affect comparisons between periods, as described further throughout this release.

Chairman's Comments

Chairman and CEO David A. Daberko commented, "The first quarter 2007 results were mixed and continue to reflect a focus on execution in our direct banking businesses. Our retail, corporate, and asset management businesses all had a solid quarter, consistent with our business plans for the year. These businesses are experiencing good growth in loan and deposit volumes and customer relationships. Both net interest margin and *credit quality have been stable*. The integration of our recently acquired Florida banks has been successfully completed. We're excited about the opportunity to build and grow the National City brand in these vibrant markets. Our mortgage business continues to operate in a difficult environment, but we have *less exposure* to the mortgage sector than in prior years. Overall, we expect each successive quarter from here to show *improved earnings*. Comparisons to the prior year will be

challenging due to the fact that 2006 results included profits from businesses we have discontinued or sold, particularly First Franklin."

\* \* \*

Loans and Deposits

Average portfolio loans were $98.2 billion for the first quarter of 2007, compared to $93.1 billion in the fourth quarter of 2006, and $105.4 billion in the first quarter of 2006. Average portfolio loans increased on a linked- quarter basis primarily due to recent acquisitions which added approximately $6 billion to portfolio loans. Average portfolio loans decreased compared to the first quarter a year ago due to the previously described originate-and- sell strategy, as well as the decision to transfer $6 billion of nonconforming mortgage loans to held for sale in the latter part of 2006.

Of the $6 billion of nonconforming mortgage loans transferred to held for sale, approximately $4 billion were sold in 2006. No further sales occurred in the first quarter of 2007. In light of unfavorable market conditions, the remaining loans totaling $1.6 billion were returned to portfolio in March 2007. Prior to that transfer, fair value writedowns and other charges of $28 million were recorded as a reduction to loan sale revenue.

Average total deposits were $87.8 billion in the first quarter of 2007, up $3.3 billion from the preceding quarter, and $4.9 billion from the first quarter a year ago, primarily due to deposit balances obtained in recent acquisitions. Average core deposits, excluding mortgage banking escrow balances, were $72.8 billion, up 9% compared to year end, and 13% compared to the first quarter last year.

Credit Quality

The provision for credit losses for the first quarter of 2007 was $107 million, compared to $323 million in the fourth quarter of 2006, and $27 million in the first quarter a year ago. As previously disclosed in the Corporation's midquarter report, one of the third party mortgage insurance providers for the run-off nonconforming mortgage loan portfolio has been rejecting a meaningful number of claims for reasons that management feels are unjustified. In light of this situation, adjustments were made to the Corporation's charge-off practices and loss forecast to reflect an assumed loss of insurance coverage for loans in dispute. Approximately $20 million of the provision for credit losses in the first quarter of 2007 arose from these revised assumptions regarding insurance coverage. Notwithstanding these adjustments, management believes it is entitled to insurance recovery and continues to pursue its contractual rights under the contract. Within the nonconforming mortgage portfolio itself, delinquencies and credit losses have been in line with loss forecasts established at the end of 2006.

First quarter 2007 net charge-offs were $147 million, compared to $128 million in the preceding quarter, and $121 million in the first quarter a year ago. Charge-offs for the first quarter of 2007 included $53 million of nonconforming mortgage loans of which approximately $24 million were associated with the previously described insurance matter. In addition, $18 million of previously reserved passenger airline leases were charged-off in the first quarter of 2007.

Nonperforming assets were $801 million at March 31, 2007, up from $732 million at December 31, 2006. The acquisition of Fidelity in the first quarter added $38 million to nonperforming assets. Loans in foreclosure increased $31 million since year end which reflects higher foreclosure rates and weakness in the housing market. The allowance for loan losses was $1.1 billion at both March 31, 2007 and December 31, 2006, representing 1.11% and 1.18% of portfolio loans, respectively.

67.     On July 26, 2007, the Individual Defendants caused or allowed National City to issue a press release announcing its fiscal second quarter 2007 earnings.  The press release reported earnings of $347 million.  Defendant Raskind commented in the press release that "Second quarter earnings were up from the first quarter due to better mortgage results, both operating and hedging, and strong performance in retail banking."  In particular, the press release provided as follows:

> National City Corporation today reported second quarter 2007 net income of $347 million, or $.60 per diluted share, compared to $319 million or $.50 per diluted share for the first quarter of 2007, and $473 million, or $.77 per diluted share for the second quarter of 2006. For the first half of 2007, net income was $666 million, or $1.09 per diluted share, compared to $932 million, or $1.51 per diluted share, for the first half of 2006. Comparisons of results to the prior year are affected by acquisition and divestiture activities and other unusual or nonrecurring transactions as described further throughout this release.

> CEO's Comments

> President and CEO Peter E. Raskind commented, "Second quarter earnings were up from the first quarter due to better mortgage results, both operating and hedging, and strong performance in retail banking. While loan and deposit volumes have been good, we continue to experience pressure on commercial loan spreads, which has hurt net interest margin. Credit trends remain stable, both in the core and run-off portfolios."

> *  *  *

> Loans and Deposits

> Average portfolio loans were $99.7 billion for the second quarter of 2007, compared to $98.2 billion in the first quarter of 2007, and $101.8 billion in the second quarter of 2006. Commercial loans drove the linked-quarter increase in average portfolio loans. Compared to the second quarter a year ago, average portfolio loans decreased due to the originate-and-sale strategy discussed above, as well as the sale of $3.9 billion of nonconforming mortgage portfolio loans in late 2006. Average loans held for sale were $12.6 billion for the second quarter of 2007, $11.8 billion in the first quarter of 2007, and $12.8 billion in the second quarter a year ago.

> Average total deposits were $90.0 billion in the second quarter of 2007, up $2.2 billion from the preceding quarter, and up $7.2 billion from the second quarter a year ago. The growth in deposits reflects growth in households, as well

as deposits obtained from recent acquisitions. Average core deposits, excluding mortgage banking escrow balances, were $74.0 billion, up $1.3 billion compared to the preceding quarter and $8.8 billion compared to the second quarter last year.

Credit Quality

The provision for credit losses was $143 million in the second quarter of 2007, compared to $107 million in the first quarter of 2007, and $60 million in the second quarter a year ago. On a year-to-date basis, the provision for credit losses for the first six months of 2007 was $250 million, up from $87 million in the year earlier period. The higher provision for credit losses in the first half of 2007 was mainly concentrated among mortgage and home equity loans, reflecting weakness in the housing market, with the First Franklin run-off portfolio accounting for approximately $70 million of the increase. At the same time, the prior year provision benefited from improving commercial credit quality and low consumer losses following the 2005 bankruptcy law change.

Second quarter 2007 net charge-offs were $98 million, compared to $147 million in the preceding quarter, and $76 million in the second quarter a year ago. The first quarter of 2007 included some relatively large charge-offs for passenger airline leases and nonconforming mortgage loans. Net charge-offs for the first half of 2007 were $245 million compared to $197 million in the prior year. Net charge-offs have increased in the first half of 2007 due to weakness in the housing market which has affected residential real estate developers and nonconforming mortgage borrowers.

Nonperforming assets were $848 million at June 30, 2007 compared to $732 million at December 31, 2006. Loans in foreclosure have increased $46 million since year end. Recent acquisitions have also added to nonperforming assets since year end. The allowance for loan losses was $1.1 billion at both June 30, 2007 and December 31, 2006, representing 1.14% and 1.18% of portfolio loans, respectively.

## THE TRUTH IS REVEALED

68.     Then, on October 24, 2007, defendants finally admitted National City's true exposure to the subprime market crisis.  Specifically, National City announced that a restructure of its mortgage business in response to "unprecedented disruption and weakness in the mortgage and housing markets."  In connection with the restructure, the Company transferred $4.4 billion of held for sale home equity lines and loans from "held for sale" to "portfolio" because those assets were no longer suitable for sale.  The Company also increased its provision for credit losses to $361 million, up from $143 million in the previous quarter.  Further, the Company announced that it was eliminating 2,500 positions.  National City's third quarter earnings press release issued on this day provided as follows:

National City Corporation today reported third quarter 2007 net income of $106 million, or $.18 per diluted share, compared to $347 million, or $.60 per diluted share for the second quarter of 2007, and $526 million, or $.86 per diluted share for the third quarter of 2006. Third quarter results include a net loss of $152 million, or $.25 per diluted share, in the Corporation's mortgage banking business.

For the nine month period ending September 30, 2007, net income was $772 million, or $1.28 per diluted share, compared to $1.5 billion, or $2.36 per diluted share, for the comparable period in 2006. Comparisons of the current year's results to the prior year were affected by mortgage losses, as well as recent acquisitions and divestitures.

CEO's Comments

President and CEO Peter E. Raskind commented, "Our third quarter results were clearly affected by the *unprecedented disruption and weakness in the mortgage and housing markets.* In response to these conditions, we have r*estructured our mortgage business*. The former National Home Equity unit has been merged into National City Mortgage, and production of non-agency eligible mortgages has been either severely curtailed or eliminated altogether. *Loans held for sale have been written down to estimated market prices, and in certain cases, moved to portfolio. Higher loan loss provisions were taken on portfolio mortgage loans, reflecting recent delinquency and loss trends, and continued deterioration in the housing markets.*

The results of these actions contributed to a *third quarter loss in our mortgage banking business*. At the same time, our retail, commercial banking and asset management businesses performed well. Deposit inflows were strong, and credit quality in the core consumer and commercial portfolios remains sound. Nonetheless, the environment continues to be quite challenging, requiring close attention to costs and relentless focus on day-to-day execution. Based on the difficult conditions in the financial markets, *which we expect to persist into 2008*, we have undertaken an aggressive review of our cost structure across the company. That review, coupled with our 2008 budget process, has resulted in *the elimination of approximately 2,500 positions representing approximately $125 million of personnel expense*."

\* \* \*

Loans and Deposits

In light of the adverse mortgage market conditions in the third quarter, management curtailed the production of certain non-agency eligible mortgage and home equity products. In addition, *approximately $4.4 billion* of held for sale home equity lines and loans were transferred to portfolio.

Average portfolio loans were $104.4 billion for the third quarter of 2007, up from $99.7 billion for the second quarter of 2007, and $97.4 billion in the third quarter of 2006. This increase reflects growth in commercial loans, recent acquisitions and the previously described transfer of home equity lines and loans to portfolio. Average loans held for sale were $12.6 billion for the third quarter of 2007, about equal to the second quarter, and down $2.4 billion from the third quarter a year ago due to the sale of the Corporation's former First Franklin unit in late 2006.

Average total deposits were $93.5 billion in the third quarter of 2007, up $3.5 billion, or 4% on a linked-quarter basis, and up $10.0 billion, or 12%, from the third quarter a year ago. The principal reasons for both the linked quarter and year-over-year

increase are recent acquisitions. Continued growth in the number of deposit accounts, as well as higher average balances held in interest-bearing accounts, also contributed to the higher deposit levels in the third quarter of 2007. Average core deposits, excluding mortgage banking escrow balances, were $77.6 billion, up $3.6 billion compared to the preceding quarter and $12.6 billion compared to the third quarter last year.

Credit Quality

The provision for credit losses was $361 million in the third quarter of 2007, up from $143 million in the preceding quarter, and $73 million in the third quarter a year ago. On a year-to-date basis, the provision for credit losses was $611 million in 2007 versus $160 million in 2006. During the third quarter of 2007, higher delinquencies, charge-offs and foreclosures occurred in residential real estate and home equity loans. In light of these trends, a larger provision for credit losses was required in the third quarter of 2007. Conversely, the provision for credit losses in 2006 benefited from improving commercial credit quality, as well as low consumer losses following the consumer bankruptcy law change in late 2005.

Net charge-offs were $141 million in the third quarter of 2007, compared to $98 million in the preceding quarter, and $117 million in the third quarter a year ago. Net charge-offs for the first nine months of 2007 were $386 million compared to $314 million in the prior year. The higher charge-offs compared to the preceding quarter were primarily due to the effects of a weakening housing market on residential real estate and home equity borrowers. On a year-over-year basis, net charge-offs for credit card and other unsecured lines of credit also increased due to the previously described effect of the bankruptcy law change.

The allowance for loan losses was $1.4 billion, or 1.23% of portfolio loans as of September 30, 2007 versus $1.1 billion, or 1.18% of portfolio loans, as of December 31, 2006. Nonperforming assets were $1.2 billion at September 30, 2007 compared to $732 million at December 31, 2006. Nonperforming assets have increased due to a larger balance of portfolio loans, inclusive of problem loans obtained in recent acquisition, and deteriorating credit quality of residential real estate loans associated with weakness in the housing markets.

69. In the wake of this devastating disclosure, National City's value declined from over $38 per share to less than $15 per share—an $11.3 billion market capitalization loss.

**REASONS THE STATEMENTS WERE IMPROPER**

70. National City's Relevant Period statements failed to disclose and misrepresented the following material adverse facts, which the Individual Defendants knew, consciously disregarded, were reckless and grossly negligent in not knowing or should have known:

(a) National City was more exposed to the subprime market crisis than it had disclosed;

(b) National City's sale of First Franklin would not shield the Company from mortgage related losses; and

(c)     As a result of the foregoing, National City's reported earnings and business prospects were inaccurate.

## THE IMPROPER BUYBACK

71.     During the Relevant Period, while National City's stock was artificially inflated due to the improper statements described above, the Director Defendants authorized the buyback of over $3.4 billion worth of its own shares at an average price of approximately $37.45 per share, which is substantially higher than National City's current share price of less than $15 per share and approximate to the $37.80  per share the defendants averaged in selling their own National City stock holdings during the Relevant Period.   On information and belief, in authorizing the buyback, the Board members failed to properly discuss and consider the Company's exposures to the subprime mortgage lending crisis.   While National City was repurchasing these shares, the Insider Selling Defendants made the sales described below.

## DAMAGES TO NATIONAL CITY CAUSED BY THE INDIVIDUAL DEFENDANTS

72.     As a result of the Individual Defendants' improprieties, National City disseminated improper statements concerning its business prospects as alleged above.   These improper statements have devastated National City's credibility as reflected by the Company's $11.3 billion market capitalization loss.

73.     Further, as a direct and proximate result of the Individual Defendants' action, National City has expended and will continue to expend significant sums of money.   Such expenditures include, but are not limited to:

(a)     Costs incurred from compensation and benefits paid to the defendants who have breached their duties to National City; and

(b)     Costs incurred from the $3.4 billion that National City spent repurchasing its own stock.

74.     Moreover, these actions have irreparably damaged National City's corporate image and goodwill.  For at least the foreseeable future, National City will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been

implicated in illegal behavior and have misled the investing public, such that National City's ability to raise equity capital or debt on favorable terms in the future is now impaired.

**INSIDER SELLING**

75.    The Insider Selling Defendants, because of their positions, knew that the statements the Company publicly made were incorrect.  They also knew that the misstatements would create an inflated stock price.  The Insider Selling Defendants took advantage of this undisclosed information to sell their personally held stock for considerably more than they were worth.  Therefore, while in possession of undisclosed material adverse information, the Insider Selling Defendants sold the following shares of National City's stock:

| Defendant | Transaction Date | Shares | Price | Proceeds |
|---|---|---|---|---|
| **Bell** | 8/31/2006 | 2,651 | $34.75 | $92,122.25 |
| | 2/6/2007 | 38,028 | $38.02 | $1,445,824.56 |
| | 2/6/2007 | 30,090 | $38.02 | $1,144,021.80 |
| | 2/6/2007 | 30,061 | $38.02 | $1,142,919.22 |
| | 2/6/2007 | 20,164 | $38.02 | $766,635.28 |
| | 2/6/2007 | 19,435 | $38.02 | $738,918.70 |
| | 2/6/2007 | 2,720 | $38.02 | $103,414.40 |
| | 8/31/2007 | 2,652 | $26.91 | $71,365.32 |
| | | **145,801** | | **$5,505,221.53** |
| | | | | |
| **Daberko** | 3/1/2007 | 9,470 | $38.49 | $364,500.30 |
| | 3/6/2007 | 106,604 | $37.39 | $3,985,923.56 |
| | 3/21/2007 | 105,923 | $37.86 | $4,010,244.78 |
| | | **221,997** | | **$8,360,668.64** |
| | | | | |
| **Frate** | 12/18/2006 | 7,866 | $36.48 | $286,951.68 |
| | | **7,866** | | **$286,951.68** |
| | | | | |
| **Gellhausen** | 11/14/2006 | 6,009 | $37.30 | $224,135.70 |
| | 11/14/2006 | 3,345 | $37.30 | $124,768.50 |
| | 1/5/2007 | 4,433 | $35.90 | $159,144.70 |
| | 1/5/2007 | 1,846 | $35.90 | $66,271.40 |
| | 1/5/2007 | 1,740 | $35.90 | $62,466.00 |
| | | **17,373** | | **$636,786.30** |
| | | | | |
| **Geraghty** | 9/19/2006 | 6,525 | $36.53 | $238,358.25 |
| | 9/19/2006 | 2,050 | $36.53 | $74,886.50 |
| | 9/19/2006 | 112 | $36.53 | $4,091.36 |
| | 2/8/2007 | 9,287 | $38.11 | $353,927.57 |

| | | 17,974 | | $671,263.68 |
|---|---|---|---|---|
| | | | | |
| **Gulick** | 1/31/2007 | 11,500 | $37.85 | $435,275.00 |
| | 1/31/2007 | 11,470 | $37.85 | $434,139.50 |
| | 1/31/2007 | 7,121 | $37.85 | $269,529.85 |
| | | **30,091** | | **$1,138,944.35** |
| | | | | |
| **Kelly** | 3/2/2007 | 43,536 | $38.13 | $1,660,027.68 |
| | 3/2/2007 | 31,476 | $38.13 | $1,200,179.88 |
| | 3/2/2007 | 20,140 | $38.13 | $767,938.20 |
| | 3/2/2007 | 19,315 | $38.13 | $736,480.95 |
| | 3/2/2007 | 2,638 | $38.13 | $100,586.94 |
| | 3/2/2007 | 2,620 | $38.13 | $99,900.60 |
| | | **119,725** | | **$4,565,114.25** |
| | | | | |
| **Lathe** | 3/1/2007 | 5,387 | $38.49 | $207,345.63 |
| | 3/1/2007 | 3,195 | $38.49 | $122,975.55 |
| | 3/1/2007 | 2,613 | $38.49 | $100,574.37 |
| | | **11,195** | | **$430,895.55** |
| | | | | |
| **MacDonald** | 12/29/2006 | 13,729 | $36.56 | $501,932.24 |
| | 12/29/2006 | 5,999 | $36.56 | $219,323.44 |
| | 12/29/2006 | 2,811 | $36.56 | $102,770.16 |
| | 12/29/2006 | 1,553 | $36.56 | $56,777.68 |
| | 12/29/2006 | 839 | $36.56 | $30,673.84 |
| | 12/29/2006 | 672 | $36.56 | $24,568.32 |
| | 12/29/2006 | 504 | $36.56 | $18,426.24 |
| | 12/29/2006 | 378 | $36.56 | $13,819.68 |
| | | **26,485** | | **$968,291.60** |
| | | | | |
| **Parker** | 11/17/2006 | 27,045 | $36.97 | $999,853.65 |
| | 2/1/2007 | 1,718 | $37.97 | $65,232.46 |
| | 2/5/2007 | 108 | $37.99 | $4,102.92 |
| | | **28,871** | | **$1,069,189.03** |
| | | | | |
| **Rice** | 11/3/2006 | 14,215 | $36.24 | $515,151.60 |
| | 11/3/2006 | 2,759 | $36.24 | $99,986.16 |
| | 2/26/2007 | 29,787 | $38.16 | $1,136,671.92 |
| | 2/26/2007 | 9,710 | $38.16 | $370,533.60 |
| | 2/26/2007 | 2,619 | $38.16 | $99,941.04 |
| | | **56,471** | | **$2,222,284.32** |
| | | | | |
| **Richlovsky** | 3/2/2007 | 29,977 | $38.13 | $1,143,023.01 |
| | | **29,977** | | **$1,143,023.01** |
| | | | | |
| **Seifert** | 10/31/2006 | 31,196 | $37.25 | $1,162,051.00 |
| | | **31,196** | | **$1,162,051.00** |
| | | | | |
| **Stitle** | 1/29/2007 | 41,757 | $37.68 | $1,573,403.76 |
| | | **41,757** | | **$1,573,403.76** |

| Tengel | 11/7/2006 | 1,598 | $37.06 | $59,221.88 |
|--------|-----------|-------|--------|------------|
|  | 3/1/2007 | 1,688 | $38.49 | $64,971.12 |
|  | 3/2/2007 | 2,410 | $38.13 | $91,893.30 |
|  | 3/2/2007 | 1,959 | $38.13 | $74,696.67 |
|  | 7/31/2007 | 1,023 | $29.39 | $30,065.97 |
|  |  | **8,678** |  | **$320,848.94** |
|  |  |  |  |  |
| Zoeller | 12/15/2006 | 2,729 | $36.61 | $99,908.69 |
|  | 3/1/2007 | 29,711 | $38.49 | $1,143,576.39 |
|  |  | **32,440** |  | **$1,243,485.08** |
|  |  |  |  |  |
| TOTAL |  | **827,897** |  | **$31,298,422.72** |

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

76.     Plaintiff brings this action derivatively in the right and for the benefit of National City to redress injuries suffered, and to be suffered, by National City as a direct result of breaches of fiduciary duty, waste of corporate assets, unjust enrichment and violations of the Exchange Act as well as the aiding and abetting thereof, by Individual Defendants.  National City is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

77.     Plaintiff will adequately and fairly represent the interests of National City in enforcing and prosecuting its rights.

78.     Plaintiff is and was an owner of the stock of National City during times relevant to the Individual Defendants' wrongful course of conduct alleged herein, and remains a shareholder of the Company.

79.     The current Board of National City consists of the following eleven individuals: defendants Raskind, Kelly, Weiss, Broadhurst, Barfield, Ormond, Thornton, Shaheen, Connor, Healy and McCallister.

80.     Defendants Raskind, Kelly, Weiss, Broadhurst, Barfield, Ormond, Thornton, Shaheen, Connor, Healy and McCallister as members of the Board during the Relevant Period authorized the repurchases of over $3.4 billion worth of the Company's shares at artificially inflated prices.  National City repurchased these shares under three stock repurchase programs that the Board authorized on October 24, 2005, December 29, 2006 and February 24, 2007.  The

Board's decisions to authorize the stock repurchases were not the product of valid business judgment. Among other things, the Board failed to properly discuss or consider National City's exposure to the subprime mortgage crisis. Further, defendant Kelly, engaged in self-dealing in that he sold his personally held shares while directing the Company to buy shares. Accordingly, demand is futile.

81. As a result of his access to and review of internal corporate documents; conversations and connections with other corporate officers, employees and directors, and attendance at management and Board meetings, defendant Kelly knew the adverse non-public information regarding National City's true business prospects. While in possession of this material adverse non-public information regarding the Company, defendant Kelly sold 119,725 shares of National City stock for proceeds of $4,565,114.25. Because defendant Kelly received a personal financial benefit from the challenged insider trading transactions, he is interested. Moreover, defendant Kelly faces a sufficiently substantial threat of liability for his breach of fiduciary duties for insider selling. Since defendant Kelly breached his fiduciary duties and is interested, any demand upon him is futile.

82. Defendants Barfield, Broadhurst, Lindner, Thornton and Weiss were, during the Relevant Period, members of the Risk and Public Policy Committee. The Risk and Public Policy Committee is responsible by its charter for reviewing and approving risk assessment and risk management policies and procedures for managing National City's credit risks. Thus, these defendants had a duty to know and accordingly did know that (i) National City faced exposure to the subprime mortgage crisis; and (ii) the Company's Relevant Period statements did not properly disclose that exposure. On information and belief, the Risk and Public Policy Committee reviewed and discussed National City's exposures to the subprime crisis, which has been ongoing since at least mid-2006, while performing its duty to implement policies and procedures to manage the Company's credit risks. Despite their knowledge of National City's exposure to the supreme mortgage crisis, these defendants consciously disregarded their fiduciary duties owed to National City by causing or allowing the improper statements alleged

-35-

above.  Accordingly, demand is futile as to defendants Barfield, Broadhurst, Lindner, Thornton and Weiss.

83.    Defendants Barfield, Broadhurst, Lindner, Thornton and Weiss were, during the Relevant Period, members of the Audit Committee.  The Audit Committee's charter provides that that the committee is responsible for reviewing and discussing earnings press releases and financial information and earnings guidance provided to analysts and rating agencies.  Thus, the Audit Committee was responsible for overseeing and directly participating in the dissemination of National City's earnings press releases.  Accordingly, defendants Barfield, Broadhurst, Lindner, Thornton and Weiss breached their fiduciary duties of due care, loyalty and good faith because the Audit Committee participated in the preparation of improper statements and earnings press releases that contained improper material information.  Particularly, these defendants reviewed and failed to correct National City's improper earnings press releases described above.  Thus, Barfield, Broadhurst, Lindner, Thornton and Weiss face a sufficiently substantial likelihood of liability for their breach of fiduciary duties so any demand upon them is futile.

84.    The principal professional occupation of Raskind is his employment with National City, pursuant to which he received and continues to receive substantial monetary compensation and other benefits.  Specifically, National City paid Raskind the following compensation:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Changes in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation |
|---|---|---|---|---|---|---|---|
| 2006 | $570,000 | $163,861 | $1,368,059 | $311,229 | $1,606,575 | $223,384 | $97,220 |

Accordingly, Raskind lacks independence from defendants Connor, Healy, Ormond and Shaheen, who are not disinterested and/or independent and who exert influence over Raskind's compensation by virtue of their positions as members of the Compensation and Organization Committee.  The Compensation and Organization Committee has the authority to review and

approve Raskind's base salary, bonus and equity compensation.  This lack of independence renders defendant Raskind incapable of impartially considering a demand to commence and vigorously prosecute this action.

85.     The principal professional occupation of Kelly is his employment with National City, pursuant to which he received and continues to receive substantial monetary compensation and other benefits.  Specifically, National City paid Kelly the following compensation:

| Fiscal Year | Salary | Bonus | Restricted Stock Awards | Option Awards | Non-Equity Incentive Plan Compensation | Changes in Pension Value and Nonqualified Deferred Compensation Earnings | All Other Compensation |
|---|---|---|---|---|---|---|---|
| 2006 | $555,000 | $337,906 | $1,722,995 | $312,591 | $1,544,018 | $384,573 | $137,768 |

Accordingly, Kelly lacks independence from defendants Connor, Healy, Ormond and Shaheen, who are not disinterested and/or independent and who exert influence over Kelly's compensation by virtue of their positions as members of the Compensation and Organization Committee.  The Compensation and Organization Committee has the authority to review and approve Kelly's base salary, bonus and equity compensation.  This lack of independence renders defendant Kelly incapable of impartially considering a demand to commence and vigorously prosecute this action.

86.     Each of the key officers and directors knew of and/or directly benefited from the wrongdoing complained of herein.

87.     The Director Defendants of National City, as more fully detailed herein, participated in, approved and/or permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from National City's stockholders or recklessly and/or negligently disregarded the wrongs complained of herein and are therefore not disinterested parties.

88.     The acts complained of constitute violations of fiduciary duties owed by National City's officers and directors and these acts are incapable of ratification.

89.     Each of the Director Defendants of National City authorized and/or permitted the false statements disseminated directly to the public or made directly to securities analysts and which were made available and distributed to shareholders, authorized and/or permitted the issuance of various improper statements and are principal beneficiaries of the wrongdoing alleged herein, and thus could not fairly and fully prosecute such a suit even if such suit was instituted by them.

90.     Moreover, despite the Individual Defendants having knowledge of the claims and causes of action raised by plaintiff, the current Board has failed and refused to seek recovery for National City for any of the wrongdoing alleged by plaintiff herein.

91.     Plaintiff has not made any demand on shareholders of National City to institute this action since such demand would be a futile and useless act for the following reasons:

(a)     National City is a publicly held company with over 633 million shares outstanding, and over thousands of shareholders;

(b)     Making demand on such a number of shareholders would be impossible for plaintiff who has no way of finding out the names, addresses or phone numbers of shareholders; and

(c)     Making demand on all shareholders would force plaintiff to incur huge expenses, assuming all shareholders could be individually identified.

92.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

93.     During the Relevant Period, the Director Defendants and defendant Kelly disseminated or approved public statements that improperly portrayed National City's business prospects, growth and margins.  The Director Defendants and defendant Kelly knew that the Company's public statements concerning its business prospects were misleading and intended to deceive, manipulate and/or defraud in connection therewith.

94.     The Insider Selling Defendants also sold over $31 million worth of shares of National City's common stock at inflated prices during the Relevant Period while in possession

of material non-public information.  These defendants misappropriated National City's proprietary information and violated their so-called "abstain or disclose" duties under the federal securities laws when they sold National City stock without disclosing the information alleged to have been concealed herein.

## COUNT I

### Derivatively Against the Director Defendants and Defendant Kelly for Violation of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder

95.    At the same time the price of the Company's common stock was inflated due to the improper reporting of the value of National City's business prospects, especially concerning the Company's exposure to the subprime mortgage market crisis, and the Insider Selling Defendants were selling stock into the market, the Director Defendants and defendant Kelly were causing National City to repurchase over $3.4 million worth of its own stock on the open market at an average inflated price of approximately $37.45 per share, which is substantially higher than National City's current share price of under $15 per share.

96.    As such, the Director Defendants and defendant Kelly violated §10(b) of the Exchange Act and SEC Rule 10b-5 in that they:

(a)    Employed devices, schemes and artifices to defraud;

(b)    Made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or

(c)    Engaged in acts, practices and a course of business that operated as a fraud or deceit upon National City and others in connection with their purchases of National City common stock during the Relevant Period.

97.    As a result of the Director Defendants' and defendant Kelly's misconduct, National City has and will suffer damages in that it paid artificially inflated prices for National City common stock purchased on the open market.  National City would not have purchased National City common stock at the prices it paid, had the market previously been aware that the market price of National City's stock was artificially and falsely inflated by defendants'

misleading statements.  As a direct and proximate result of these defendants' wrongful conduct, National City suffered damages in connection with its purchases of National City common stock during the Relevant Period.  By reason of such conduct, the Director Defendants and defendant Kelly are liable to the Company pursuant to §10(b) of the Exchange Act and SEC Rule 10b-5 promulgated thereunder.

## COUNT II

### Against All Defendants for Breach of Fiduciary Duty

98.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

99.    The Individual Defendants owed and owe National City fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe National City the highest obligation of good faith, fair dealing, loyalty and due care.

100.    The Individual Defendants, and each of them, violated and breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

101.    Each of the Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly misrepresent the Company's business prospects and financial results.  The Individual Defendants also had actual or constructive knowledge that they were improperly causing National City to repurchase over $3.4 billion of its own stock at artificially inflated prices.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

102.    As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, National City has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

103.    Plaintiff, on behalf of National City, has no adequate remedy at law.

## COUNT III

### Against the Insider Selling Defendants for Breach of Fiduciary
### Duties for Insider Selling and Misappropriation of Information

104.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

105.     At the time of the stock sales set forth herein, the Insider Selling Defendants knew the information described above, and sold National City common stock on the basis of such information.

106.     The information described above was proprietary non-public information concerning the Company's financial condition and future business prospects.  It was a proprietary asset belonging to the Company, which the Insider Selling Defendants used for their own benefit when they sold National City common stock.

107.     At the time of their stock sales, the Insider Selling Defendants knew that the Company's revenues were materially overstated.  The Insider Selling Defendants' sales of National City common stock while in possession and control of this material adverse non-public information was a breach of their fiduciary duties of loyalty and good faith.

108.     Since the use of the Company's proprietary information for their own gain constitutes a breach of the Insider Selling Defendants' fiduciary duties, the Company is entitled to the imposition of a constructive trust on any profits the Insider Selling Defendants obtained thereby.

## COUNT IV

### Against All Defendants for Breach of Fiduciary Duty for Abuse of Control

109.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

110.     The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence National City, for which they are legally responsible.  In particular, the Individual Defendants abused their positions of authority by causing or allowing National City to issue statements that improperly portrayed National City's business prospects.

111.    As a direct and proximate result of the Individual Defendants' abuse of control, National City has sustained significant damages.  These damages include, but are not limited to, National City's severe loss of market credibility as reflected in its $11.3 billion market capitalization loss and $3.4 billion paid to repurchase the Company's stock.

112.    As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

113.    Plaintiff, on behalf of National City, has no adequate remedy at law.

## COUNT V

**Against All Defendants for Breach of Fiduciary Duty for Gross Mismanagement**

114.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

115.    By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of National City in a manner consistent with the operations of a publicly held corporation.

116.    As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, National City has sustained significant damages in excess of hundreds of millions of dollars.

117.    As a result of the misconduct and breaches of duty alleged herein, the Individual Defendants are liable to the Company.

118.    Plaintiff, on behalf of National City, has no adequate remedy at law.

## COUNT VI

**Against All Defendants for Waste of Corporate Assets**

119.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

120.    As a result of the misconduct described above, and by failing to properly consider the interests of the Company and its public shareholders by failing to conduct proper

supervision, paying $3.4 billion to repurchase the Company' stock and paying bonuses to certain of its executive officers.

121.    As a result of the waste of corporate assets, the Individual Defendants are liable to the Company.

122.    Plaintiff, on behalf of National City, has no adequate remedy at law.

## COUNT VII

### Against All Defendants for Unjust Enrichment

123.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

124.    By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of National City.

125.    Plaintiff, as a shareholder and representative of National City, seeks restitution from these defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits and other compensation obtained by these defendants, and each of them, from their wrongful conduct and fiduciary breaches.

### PRAYER FOR RELIEF

WHEREFORE, plaintiff demands judgment as follows:

A.    Against all of the Individual Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties, waste of corporate assets and unjust enrichment;

B.     Declaring that the Director Defendants and defendant Kelly are liable under of §10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder and awarding National City damages;

C.    Directing National City to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect National City and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to

the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

      1.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

      2.      a provision to permit the shareholders of National City to nominate at least three candidates for election to the Board;

      3.      a proposal to ensure the accuracy of the qualifications of National City's directors, executives and other employees;

      4.      a proposal to control insider selling;

      5.      a proposal to ensure that National City prudently expends funds in stock repurchase programs;

      6.      a proposal to better manage and disclose National City's credit risks; and

      7.      appropriately test and then strengthen the internal audit and control functions.

D.      Extraordinary equitable and/or injunctive relief as permitted by law, equity and state statutory provisions sued hereunder, including attaching, impounding, imposing a constructive trust on or otherwise restricting defendants' assets so as to assure that plaintiff on behalf of National City has an effective remedy;

E.      Awarding to National City restitution from the defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the defendants;

F.      Awarding to plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs and expenses; and

G.      Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

DATED:  January 18, 2008                    LANDSKRONER • GRIECO • MADDEN, LTD.
                                            JACK LANDSKRONER


                                            s/Jack Landskroner
                                            _____
                                                JACK LANDSKRONER (0059227)

                                            1360 West 9th St., Suite 200
                                            Cleveland, OH 44113
                                            Telephone: (216) 522-9000
                                            Facsimile: (216) 522-9007

                                            ROBBINS UMEDA & FINK, LLP
                                            JEFFREY P. FINK
                                            MARK A. GOLOVACH
                                            SHANE P. SANDERS
                                            610 West Ash Street, Suite 1800
                                            San Diego, CA 92101
                                            Telephone: (619) 525-3990
                                            Facsimile:  (619) 525-3991

                                            LAW OFFICES OF ALFRED G. YATES, JR.
                                            ALFRED G. YATES
                                            519 Allegheny Building
                                            429 Forbes Avenue
                                            Pittsburgh, PA 15219-1649
                                            Telephone: (412) 391-5164
                                            Facsimile: (412) 471-1033

                                            Attorneys for Plaintiff